IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ANDREW KANE, | * | |
|     Plaintiff, | * | |
| | * | |
| v. | * | Civil No. L-08-1157 |
| | * | |
| BRIAN LEWIS, et al. | * | |
|     Defendants. | * | |
| | * | |

*************

## **MEMORANDUM**

This is a wrongful death case. The plaintiff, Andrew Kane ("Kane"), is the father of Andrew Cornish ("Cornish"). Cornish was fatally wounded during the execution of a narcotics warrant at his apartment in Cambridge, Maryland, in 2005. On May 5, 2008, Kane filed a complaint against defendants Brian Lewis ("Detective Lewis"), John Lewis ("Sergeant Lewis"), Jensen Shorter ("Officer Shorter"), Leaf Lowe ("Detective Lowe"), Kenneth Malik (individually and as Chief of Police), and the Commissioners of Cambridge. Kane alleged six counts:

    Count 1:    42 U.S.C. § 1983—Wrongful Death

    Count 2:    42 U.S.C. § 1983—Survival Action

    Count 3:    Maryland Constitutional Claims—Wrongful Death

    Count 4:    Maryland Constitutional Claim—Survival Action

    Count 5:    42 U.S.C. § 1983—<u>Monell</u> Claim (against the Commissioners of Cambridge for failure to adequately train, supervise and discipline the officers)

    Count 6:    42 U.S.C. § 1983—Chief of Police (against the Chief of Police for failure to adequately train and supervise the officers)

Following initial discovery, defendants moved for summary judgment. Paper No. 35. Oral arguments were heard on February 25, 2010. For the reasons stated herein, the motion will, by separate Order of even date, be GRANTED in part and DENIED in part.

## I. BACKGROUND

The undisputed facts are as follows. During the week of March 28, 2005, the City of Cambridge Police Department received an anonymous tip that there was drug activity at 408 High Street in Cambridge, Maryland. Cambridge police began an investigation. On April 5 and April 19, 2005, Detectives Lowe and Lewis[1] removed trash bags from the sidewalk directly in front of 408 High Street. The detectives searched the bags and discovered trace amounts of marijuana, drug paraphernalia, and mail addressed to Nathan Larry Latting Jr. ("Latting"), occupant of apartment A, in one bag and trace amounts of marijuana, drug paraphernalia, and mail addressed to Cornish, occupant of apartment B, in another bag. Def. Ex. 1, p. 78, line 18; Def. Ex. 3, p. 2–3; Def. Ex. 2, p. 2–3. Detective Lowe testified that he did "very little surveillance" of 408 High Street. Pl. Ex. 1, p. 11.

Based on this information, Detective Lowe presented search warrant applications for both apartments to Dorchester County District Judge John L. Norton III on April 25, 2005. Finding that probable cause existed for the search of each apartment, Judge Norton issued the separate warrants on April 25, 2005.

Eleven days later, on May 6, 2005, the warrants were executed.[2] The search was executed by the members of the Emergency Response Team and the Narcotics Enforcement

---

[1] Brian Lewis no longer works for the Cambridge Police Department.
[2] Under Maryland law, a search warrant must be executed within 15 days of its issuance. MD. CODE ANN., CRIM. PRO. § 1-203(a)(4)(1). Detective Lowe testified that the warrants were executed after the beginning of the month because, in his experience, "most drug users and abusers, sometimes distributers, will wait until the first of the month to . . . re-up their supply . . . of narcotics." Def. Ex. 1, p. 81, lines 9–13.

Team.[3]  The officers were organized in two teams, one for each apartment.  The four officers assigned to apartment B were Officer Shorter, Detective Lewis, Detective Lowe, and Sergeant Lewis.

The officers arrived at 408 High Street at approximately 4:30 a.m.  They planned to make silent entry at the common door, if unlocked, and simultaneously knock and announce at the doors to both apartments.  Each team planned to enter its designated apartment dynamically, meaning the officers would knock and announce, shortly thereafter breach the door, and quickly secure the residence before any suspects could escape, arm themselves, or destroy potential evidence.

After entering the common door, the apartment B team climbed the stairs and lined up outside apartment B.  The officers breached the door began their search seconds after the apartment A team made its entry.[4]  Officer Shorter and Detective Lewis entered left to clear the living room and the master bedroom.  Sergeant Lewis and Detective Lowe entered right to clear the bathroom, second bedroom, and kitchen.  During the search of apartment B, Cornish emerged from the master bedroom and crossed the living room toward the kitchen and toward Detective Lewis, who was backpedaling away from Cornish.  Before Cornish reached the entry to the kitchen, Detective Lewis fired two shots, one hitting Cornish in the cheek and the other hitting Cornish in the forehead.  Cornish fell to the floor, landing halfway between the living room and the kitchen.  Immediately after Cornish was shot, Detective Lowe checked Cornish's vital signs and found no pulse.  A 15 inch knife in a black sheath was recovered from underneath Cornish's right leg.

---

[3] The officers wore clothing that displayed the word "police," and had their badges clipped to or screen printed on their shirts.

[4] The search of apartment A revealed 86 grams of crack cocaine, 7 grams of marijuana, scales, and $1,600.00 in U.S. currency.  Officers found 2 bags of marijuana, 25 rounds of .32 caliber ammunition, and $900.00 in U.S. currency in apartment B.

The autopsy report stated that Cornish was killed by two gunshots to the face and head. The injury to his left cheek showed no evidence of soot or gunpowder stippling indicative of a close-range shot. The wound path was slightly left to right and downward. The injury to Cornish's right forehead also showed no soot or gunpowder stippling. The wound path was front to back and slightly downward.

Beyond these basic facts, the parties offer significantly different versions of the details. Specifically, the parties disagree as to certain aspects of the search execution and what transpired in the moments before Cornish was shot.

Defendants argue that the officers knocked and announced their presence and purpose before making dynamic entry into the apartments. Specifically, they contend that Detective Lowe knocked at the exterior common door and yelled, "Cambridge Po-lice, search warrant." Def. Ex. 1, p. 25, lines 12-14. After the officers breached the exterior common door with a ram, defendants claim that several officers began shouting "Cambridge Po-lice, search warrant" as they lined up outside both interior doors. The officers assigned to apartment B testified that once they positioned themselves outside the door to apartment B, Officer Shorter knocked and announced twice before Detective Lewis breached the door with the ram.

Kane argues that the officers did not knock and announce at any door. He contends that the exterior common door was unlocked and that the officers were able to, and did, make a silent entry. Kane points to testimony by Latting and building owner, Jeffery Dayton ("Dayton"), that the common door was never locked, He also points to Dayton's testimony that there was no damage to the exterior door from any alleged forced entry by the police, despite significant damage to both interior doors caused by the ram.

4

Kane further relies on testimony by Karen Camper ("Camper") and Nathan Latting, occupants of apartment A, that no knocks or announcements were made at the exterior common door or the interior doors. Specifically, Camper testified that the first sound she heard, rousing her from sleep, was a loud "boom" coming from the interior door to apartment A and that she did not hear any announcements from the officers until they were in both apartments. She also testified that she did not hear the word "police" until an officer came into her room. Latting similarly testified that at the time the police burst into apartment A, he was crossing the living room on his way to the bathroom. Before the door burst open, Latting testified that he heard no noise. He further testified that if any knocks or announcements were made at the exterior or either interior doors, he would have heard them.

The parties dispute what happened in the moments leading up to Cornish's death. Upon entry into apartment B, Detective Lewis testified that he followed Officer Shorter into the living room. Because a television and a light in the kitchen were on, Detective Lewis could "see pretty much everything." Def. Ex. 2, p. 109–10, lines 21–1. Detective Lewis stated that he and the other three officers were yelling "Cambridge police, search warrant" the entire time. Id. at p. 112, lines 19–21; p. 116, lines 19–21. Officer Shorter and Detective Lewis cleared the living room and proceeded to the master bedroom. Shorter attempted to kick the door to the bedroom in, but it would not open.[5] Detective Lewis was standing to Officer Shorter's right when the "door [flew] out into the living room," causing Officer Shorter to disappear from his view. Id. at p. 118. Detective Lewis stated that he then saw a black male wearing light colored boxer shorts carrying a knife in his right hand.[6] The man, Cornish, crossed the living room at a "rapid pace"

---

[5] Unbeknownst to the officers at the time, the door to the bedroom opened out into the living room instead of into the bedroom.
[6] Detective Lewis described the knife as a "butcher knife approximately 12 to 14 inches long" but also testified that he never saw the blade. Def. Ex. 2, p. 124, lines 13–18.

5

toward Detective Lewis. Id. at p. 129, line 8. Detective Lewis backpedaled, screaming at Cornish repeatedly to "drop the knife." Id. at p. 129, lines 12–14. As Detective Lewis described it, Cornish "chase[d] me across this living room." Id. at p. 130, lines 17–18. According to Detective Lewis, Cornish was also swinging the knife back and forth in a threatening manner. Approximately half way across the living room, Detective Lewis testified, Cornish raised and kept the knife above his right shoulder. Detective Lewis backed into the kitchen where he then "ran into something."[7] Id. at p. 133, line 10. At that point, Detective Lewis stated that Cornish was approximately three to four feet away from him. Detective Lewis, "in fear for [his] life," raised his gun and fired two quick shots; "bang, bang," he said. Id. at p. 134, line 16; p. 138, line 4. Despite "aiming for center mass," id. at p. 135, lines 7–8, both of Detective Lewis's shots hit Cornish in the head. Cornish fell to the ground and Detective Lewis holstered his weapon. Detective Lowe escorted Detective Lewis out of the apartment and downstairs. At the bottom of the stairs, Corporal Henry took Detective Lewis's gun.

     Officer Shorter testified that when the master bedroom door came open, it hit him in the center of his body and helmet, knocking him off balance to the right of the door. By the time he was able to regain his balance and turn around, he saw Cornish crossing the living room waving what he believed to be a "machete" over his head. Def. Ex. 6, p. 46, line 7. Officer Shorter testified that he could not see Detective Lewis, but believed him to be in "imminent danger." Id. at p. 53, line 7. After Cornish was shot, Officer Shorter shouted for someone to call an ambulance, cleared the master bedroom (noticing that Cornish kept a sword collection), returned to the living room and saw Detective Lowe checking Cornish for vital signs, and took up post at the door to the apartment to log who came and left.

---

[7] Although Detective Lewis does not know what stopped his backward motion, Sergeant Lewis testified that Detective Lewis backed into him and the kitchen table.

Sergeant Lewis and Detective Lowe also testified as to what transpired in apartment B at the time of the shooting. After clearing the bathroom and the second bedroom, Detective Lowe saw out of his peripheral vision Detective Lewis backpedaling from the living room into the kitchen. Detective Lowe could see Detective Lewis's mouth moving but could not hear what Detective Lewis was saying. Detective Lowe then observed Cornish moving toward Detective Lewis at a fast pace. He testified that he could not see the right side of Cornish's body and therefore could not see if Cornish carried an object in his right hand. Detective Lowe said Detective Lewis's gun was in the ready position, approximately a foot away from Detective Lowe's face. After Detective Lewis fired two quick shots, Detective Lowe checked Cornish's vital signs and felt no pulse. He then left the apartment to call for an ambulance. After returning to the apartment, Detective Lowe stated that he then saw a knife in a black sheath under Cornish's right leg.

Similarly, Sergeant Lewis recalled seeing Cornish crossing the living room toward Detective Lewis just before Detective Lewis backed into him.[8] He also saw Detective Lewis saying something but could not make out the words. Sergeant Lewis testified that he thought he saw a black pipe-like item in Cornish's hand, and that Cornish was holding this item near the right side of his head when he was shot by Detective Lewis.

Kane disputes the defendants' version of the events. Other than the officers, there were no eyewitnesses to the shooting. Based on expert testimony, Kane contends that at the time of the shooting, Cornish did not have the knife in his hand and was attempting to duck away from Detective Lewis's gun. Kane relies primarily on the expert opinion of Dr. John Adams. Dr. Adams testified on deposition that, based on the pattern of blood spillage on the floor, the shot to Cornish's left cheek came first followed by the shot to Cornish's forehead. Dr. Adams opined

---

[8] Sergeant Lewis stated that Cornish was "all over top of" Detective Lewis. Def. Ex. 5, p. 58, lines 4–5.

that the downward trajectory of the first bullet indicated that Cornish's head was facing down in some fashion, either with his chin to his chest or because Cornish was bent over. Dr. Adams stated that the trajectory of the second bullet was only slightly downward, indicating that Cornish's head was not as low as it would have been at the time of the first shot. Dr. Adams also concluded that Cornish could not have been holding the knife in his right hand at the time of the second shot.[9] He stated that the second shot caused "blowback" of blood and brain material to exit from the entry wound and spatter on Cornish's raised right hand, but no such material was found on the knife or its sheath. Specifically, Dr. Adams stated "if he had had anything in his hand, the item would have had similar blood spatter on it." Pl. Ex. 9, p. 29, lines 17–19.

Next, Kane points out that the officers met and conferred before they gave their first official statements. Because of this, he contends that their story should be viewed with deep suspicion. Kane points out that Detective Lewis spoke with Officer Shorter, Detective Lowe, Sergeant Lewis, and his attorney before giving his first formal interview on May 13, 2005. The officers also met as a group for counseling on May 9, 2005. Before Detective Lewis's May 13, 2005 interview, he spoke with the Maryland State Police investigator for approximately 45 minutes, but he did not recall what they discussed.

Kane also offers two additional theories regarding the events. First, he posits that Cornish did not have a knife at all when he crossed the living room but that a knife was planted under his leg by one of the officers after Detective Lewis left the room. Second, he posits that Cornish was in the process of answering the door (assuming that the officers did knock and

---

[9] When specifically asked during his deposition, Dr. Adams stated that it was likely that the knife was in Cornish's right hand at the time of the first shot based on the information he received:
> Q: Do you have any reason to believe, based on your investigation, that [the knife] was already on the floor in the position we see it in the photographs, prior to the police entry into the apartment?
> A: No. The information that came along with the case was that he came out of the room waving the knife like a machete. And so I assume from that that he did have it in his hand.

Pl. Ex. 9, p. 17, lines 5–14.

announce), and had almost reached the kitchen, when the officers breached the door. Not expecting to see anyone standing in the living room, Detective Lewis was surprised by Cornish and shot him without assessing the situation, Kane posits.

## II.   STANDARD OF REVIEW

The Court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (recognizing that trial judges have "an affirmative obligation" to prevent factually unsupported claims and defenses from proceeding to trial). Nevertheless, in determining whether there is a genuine issue of material fact, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. Pulliam Inv. Co. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987).

## III.   ANALYSIS

### A.   Evidentiary Issue

Kane has objected to Defendants' Exhibit 14, a report by the Maryland State Police. Kane argues that the report contains inadmissible hearsay and statements and conclusions of persons who were not personal witnesses.

Federal Rule of Evidence 803(8)(C) permits the introduction of factual findings by police or law enforcement investigative reports made pursuant to authority granted by law in civil cases, so long as the sources of information or other circumstances do not indicate a lack of trustworthiness. Courts may look to several factors to determine if the report is admissible: "(1)

the timeliness of an investigation; (2) the special skill or experience of the official; and (3) possible motivational problems." Ellis v. Int'l Playtex, Inc., 745 F.2d 292, 300–01 (4th Cir. 1984).

On May 16, 2005, Chief of Police Kenneth Malik requested that the Maryland State Police conduct an investigation into the "police-involved" shooting of Cornish. By letter dated June 3, 2005, the Maryland State Police confirmed that personnel in its Internal Affairs Section had been assigned to the task. On December 1, 2005, in a report signed by Detective Sergeant David A. Briscoe, the Internal Affairs Section recommended that Detective Lewis's shooting of Cornish be classified as justified. This Court finds that the investigation was requested and conducted in a timely manner. Additionally, the investigation was conducted by a third party that regularly investigates police officer actions, and this Court is satisfied that the report is generally trustworthy. Accordingly, the report prepared by the Maryland State Police is admissible based on the exception to the hearsay rule found in Rule 803(8).

### B. Federal and State Constitutional Claims

Kane argues in his complaint that the officers violated Cornish's Fourth Amendment and state constitutional rights because the search warrant was not supported by probable cause, the search was unreasonably executed, and Detective Lewis used excessive force against Cornish.[10] The defendants argue that the officers did not violate Cornish's constitutional rights, and that the individual officers are protected from liability by the doctrine of qualified immunity.

---

[10] "The standards for analyzing claims of excessive force are the same under Articles 24 and 26 of the Maryland Constitution as that under the Fourth Amendment of the United States Constitution." Hines v. French, 852 A.2d 1047, 1069 (Md. Ct. Spec. App. 2004) (citing Williams v. Prince George's County, 685 A.2d 884 (Md. Ct. Spec. App. 1996)). Likewise, probable cause and improper warrant execution claims under Article 26 of the Maryland Declaration of Rights are considered *in pari materia* with the Fourth Amendment of the United States Constitution. See Ford v. State, 967 A.2d 210, 231 (Md. Ct. Spec. App. 2009).

### 1.   Alleged Probable Cause Violation

Kane argues in his complaint that Detective Lowe, in applying for the warrant to search Cornish's apartment, deliberately or recklessly submitted a misleading affidavit by omitting material facts. In a Letter Order dated January 7, 2010, the Court determined that the search warrant for Cornish's apartment was supported by probable cause. Paper No. 54.

### 2.   Alleged Improper Warrant Execution

Kane next argues that the search of Cornish's apartment was unreasonable because the officers failed to knock and announce their presence and purpose before entering. Defendants contend that the warrant was reasonably executed, pointing to the deposition testimony of each officer stating that they did knock and announce at both the common door and the door to Cornish's apartment.

Whether the officers knocked and announced before they executed the search warrant is a factor to be considered in determining whether the search was reasonable under the Fourth Amendment. See Wilson v. Arkansas, 514 U.S. 927, 934 (1995). Even if the officers failed to knock and announce, their search of Cornish's apartment may still be reasonable if exigent circumstances existed at the time of execution.[11] Exigent circumstances exist if the officers executing a warrant have a reasonable suspicion that the circumstances present a threat of physical violence, that evidence would likely be destroyed if advance notice were given, or if the knock and announce would be futile. Richards, 520 U.S. at 391, 394; Wilson v. Arkansas, 514 U.S. 927, 936 (1995). The reasonable suspicion standard does not require a high showing. Richards, 520 U.S. at 394–95.

Defendants' motion for summary judgment on this point fails because a dispute of material fact exists as to whether the officers knocked and announced. Defendants' motion also

---

[11] The parties agree that the warrant was not a "no-knock" warrant.

fails because they point to no facts that would support a finding of exigent circumstances. First, service of a narcotics warrant does not, by itself, provide reasonable suspicion to believe that evidence will be destroyed. See id. at 394 (noting that such per se exceptions would render the knock and announce requirement meaningless); U.S. v. Singleton, 441 F.3d 290, 293–94 (4th Cir. 2006) (same). Second, Cornish had no history of violence and the officers had no reason to believe that Cornish would be uncooperative.[12] Third, the defendants have not argued that the knock and announce would have been futile. Accordingly, a jury must decide whether the officers knocked and announced their presence before entering Cornish's apartment.

### 3. Alleged Excessive Use of Force

Kane further argues that Detective Lewis used excessive force against Cornish by shooting and killing him.[13] Defendants counter in their motion for summary judgment that Detective Lewis's actions were objectively reasonable from the perspective of a hypothetical reasonable officer on the scene.

The Fourth Amendment protects citizens from unreasonable seizures, thus prohibiting the use of excessive force by police officers to seize a free citizen.[14] Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003). This right was clearly established on May 6, 2005.

It is undisputed that at some point during the search of his apartment, Cornish came out of his bedroom and crossed the living room toward the kitchen. It is unknown whether Cornish was attempting to escape the apartment (as the front door to the apartment was located in the kitchen) or whether he intended to engage an unknown intruder or a police officer.

---

[12] Detective Lowe stated on deposition that Cornish had been cooperative during a previous narcotics investigation that focused on apartment A.

[13] Only Detective Lewis fired his weapon, therefore, only he can be said to have used excessive force. Kane's excessive force claims do not apply to the remaining defendants.

[14] Detective Lewis seized Cornish by shooting and killing him. See Garner, 471 U.S. at 7.

Kane argues that a jury could find that Cornish was not holding anything as he crossed the living room and that the police planted the knife on Cornish's body as part of a cover up. A fair minded jury could not reach this conclusion. No evidence in the record supports this hypothesis. The consistent eyewitness testimony is that Cornish carried a weapon-like object in his hand, variously described as a machete, a pipe, and a knife, as he advanced toward Detective Lewis. Kane can offer no eyewitness testimony to the contrary, and his expert testimony is not strong enough to place this issue in legitimate doubt. The best his expert can testify is that the knife was not in Cornish's hand at the time the second shot was fired.

In this context, it is prudent to proceed directly to the qualified immunity analysis. Qualified immunity shields police officers from civil liability unless the officer reasonably should have known that his actions violated a clearly established constitutional right. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The reasonableness inquiry is objective and a court is to examine only the actions at issue and measure them against what a reasonable police officer would do under the circumstances. Rowland v. Perry, 41 F.3d 167, 172 (4th Cir. 1994). Despite its focus on the objective facts, the immunity inquiry is to be "filtered through the lens of the officer's perceptions at the time of the incident in question." Id. at 173. An officer should be protected by qualified immunity if a hypothetical reasonable officer possessing the same information could have believed that his conduct was lawful. Slattery v. Rizzo, 939 F.2d 213, 216 (4th Cir. 1991). Accordingly, if a reasonable officer could have found probable cause to believe that Cornish presented an immediate threat of death or serious physical harm at the time Detective Lewis shot him, then as a matter of law, Detective Lewis is entitled to qualified immunity.

Based on the evidence in the record, a fair minded jury must conclude that (i) Cornish was advancing toward Detective Lewis at a rapid pace, (ii) Cornish came very close to Detective Lewis, and (iii) Cornish was carrying a weapon-like object in his right hand at approximately ear level. On these facts, a reasonable officer possessing this information could have had probable cause to believe that Cornish presented a deadly threat. Therefore, the officer would be authorized to use deadly force.[15] Accordingly, the Court is satisfied that Detective Lewis is entitled to qualified immunity with respect to the excessive force claim.

### C. Maryland Statutory Immunity

Defendants argue in their motion for summary judgment that even if Kane is able to demonstrate some negligent act on the part of defendants, they are nevertheless entitled to statutory immunity pursuant to Maryland Code, Courts and Judicial Procedure, § 5-507(b), because Kane cannot prove that the officers acted with malice.[16]

Defendants' argument is misplaced. The common law public immunity doctrine did not provide immunity for constitutional violations prior to the enactment of the statutory analogue. Thus, § 5-507(b) does not provide immunity for the constitutional violations alleged in this case. Houghton v. Forrest, 959 A.2d 816, 827 n.6 (Md. Ct. Spec. App. 2008). Kane states only constitutional claims against defendants, therefore, § 5-507(b) is not applicable. Accordingly, Kane is not required to prove malice and defendants cannot seek summary judgment based on his failure to do so.

---

[15] As a matter of comparison, the Fourth Circuit has found an officer's use of deadly force to be protected, even when the recipient of that force was unarmed. See Anderson v. Russell, 247 F.3d 125, 130 (4th Cir. 2001) (holding that an officer's use of deadly force was protected because the officer had received a tip, albeit incorrect, that the man was armed); Milstead v. Kibler, 243 F.3d 157, 160, 165 (4th Cir. 2001) (holding that an officer's use of deadly force was protected despite having shot the innocent, unarmed victim before verifying that he was not the perpetrator).

[16] § 5-507(b) states: "An official of a municipal corporation, while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action."

### D. Liability for the Commissioners of Cambridge and Chief of Police Malik

The liability counts against the Commissioners of Cambridge and the Chief of Police will remain stayed until the resolution of the warrant execution issue.

## IV. CONCLUSION

For the foregoing reasons, the Court will, by separate Order of even date, GRANT in part and DENY in part defendants' Motion for Summary Judgment.

It is so ORDERED this 26th day of March, 2010.

/s/
Benson Everett Legg
United States District Judge